# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 14-0592 JB

RAUL BURCIAGA-DUARTE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Raul Burciaga-Duarte's sentencing. The Court held a sentencing hearing on August 8, 2014. The primary issue is whether the Court should sentence Burciaga-Duarte to a sentence at the low end of the Sentencing Guidelines range of 57 to 71 months, which the statutory minimum under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) cuts off at 60 months. Because the Court is concerned about the effect of the Executive Branch's policy of inconsistently prosecuting federal marijuana laws across the country, the Court will sentence Burciaga-Duarte to the statutory minimum of sixty-months imprisonment.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed June 25, 2014 ("PSR"), that the United States Probation Office ("USPO") prepared. On February 4, 2014, a 1994 white Chevrolet Suburban bearing a Mexican license plate attempted to enter the United States from Mexico through the Presidio, Texas, Port of Entry. See PSR ¶ 12, at 4. Customs and Border Protection ("CBP") officers used a fiber optic scope to exam the Suburban's fuel tank and discovered metal boxes concealed inside. See PSR ¶ 12, at 4. CBP officers then

sent the Suburban through an x-ray machine, which revealed four large non-factory boxes hidden in the fuel tank.  See PSR ¶ 12, at 4.

Suspecting that the boxes contained illegal drugs, Homeland Security Investigations ("HSI") agents decided to escort the Suburban to its original destination: a hotel parking lot located on Interstate 40 and Eubank in Albuquerque, New Mexico.  See PSR ¶ 13, at 4.  An undercover agent accompanied the Suburban's driver on the trip.  See PSR ¶ 13, at 4.  Two men -- later identified as Alfredo Arroyo-Dominguez and Burciaga-Duarte -- arrived in a red Pontiac sedan to pick up the Suburban.  See PSR ¶ 13, at 4.  The undercover agent handed the Suburban's keys to Burciaga-Duarte, who then handed the keys to Arroyo-Dominguez.  See PSR ¶ 13, at 4.  Burciaga-Duarte instructed Arroyo-Dominquez to take the Suburban to Burciaga-Duarte's residence.  See PSR ¶ 13, at 4.  The undercover agent and Burciaga-Duarte walked back to the Pontiac, and Burciaga-Duarte paid the agent $1,000.00.  See PSR ¶ 13, at 4.  Burciaga-Duarte told the undercover agent that he would be working on the Suburban in the morning and that he did not know when he would return it.  See PSR ¶ 13, at 4.  Burciaga-Duarte asked the undercover agent if he knew where "it" -- i.e., the marijuana -- was located inside the Suburban. See PSR ¶ 13, at 4.  The undercover agent replied that he did not know where it was and that he was just the driver.  See PSR ¶ 13, at 4.

Agents followed Arroyo-Dominquez, who drove the Suburban, and Burciaga-Duarte, who drove the Pontiac, to a trailer[1] on Atrisco Vista Boulevard in Albuquerque.  See PSR ¶ 14, at 4.  Arroyo-Dominguez subsequently drove away from the trailer in the Pontiac.  See PSR ¶ 19, at 5.  Agents conducted a traffic stop of the Pontiac and took Arroyo-Dominguez to the HSI

---

[1]The PSR does not explain what kind of trailer it is, but refers to the trailer as Burciaga-Duarte's "residence," PSR ¶ 14, at 4, and explains that a gun was found under a mattress in Burciaga-Duarte's "bedroom," PSR ¶ 15, at 4.  The Court therefore concludes that the trailer to which the PSR refers is either a recreational vehicle or a mobile home.

Albuquerque office.  See PSR ¶ 19, at 5.  There, Arroyo-Dominguez told the agents that Burciaga-Duarte asked him to pick up a vehicle at a hotel, because it needed mechanical work. See PSR ¶ 19, at 5.  The criminal complaint against Arroyo-Dominguez was dismissed the following day for insufficient evidence.  See PSR ¶ 19, at 5.

After Arroyo-Dominguez left the trailer, the agents conducted a "knock and talk" at the trailer, and encountered Burciaga-Duarte and Rafael Ortiz-Carillo.  PSR ¶ 14, at 4.  Burciaga-Duarte said that he owned the trailer and gave consent for the agents to search it.  See PSR ¶ 14, at 4.  Inside the trailer, agents found keys to the Suburban, Burciaga-Duarte's cellular telephone, and a loaded nine-millimeter Ruger pistol under Burciaga-Duarte's mattress in his bedroom.  See PSR ¶ 15, at 4.  Agents also discovered: (i) four rounds of Winchester nine-millimeter Luger ammunition; (ii) four rounds of DNL nine-millimeter Luger ammunition; and (iii) one round of PMC nine-millimeter Luger ammunition.  See PSR ¶ 15, at 4-5.  The agents subsequently arrested Burciaga-Duarte.  See PSR ¶ 16, at 5.

After he was arrested, Burciaga-Duarte agreed to talk with the agents.  See PSR ¶ 16, at 5.  He said that a person that he knew only as "Sergio" asked him to pick up the Suburban and take it to Burciaga-Duarte's house.  PSR ¶ 16, at 5. Burciaga-Duarte said that Sergio lived in Mexico.  See PSR ¶ 16, at 5.  After initially saying that he did not know there were illegal drugs in the Suburban, Burciaga-Duarte admitted that he knew it contained drugs but did not know the drugs' type or quantity.  See PSR ¶ 16, at 5. Burciaga-Duarte admitted that he owned the handgun found under his mattress and that he bought it four or five years ago from an unidentified male in Bernalillo, New Mexico.  See PSR ¶¶ 16-17, at 5.

Burciaga-Duarte acknowledged that he is a Mexican citizen who is unlawfully living in the United States.  See PSR ¶ 17, at 5.  Agents asked Burciaga-Duarte if he knew that it was

illegal for an undocumented immigrant to possess a firearm, and Burciaga-Duarte said that he did.  See PSR ¶ 17, at 5.  Burciaga-Duarte told the agents that Rafael Ortiz-Carillo was his roommate and had nothing to do with the drug-smuggling operation.  See PSR ¶ 18, at 5.  Ortiz-Carillo later confirmed this information and said that he had never seen the Suburban before that day.  See PSR ¶ 18, at 5.  Burciaga-Duarte also reported that Arroyo-Dominguez had no knowledge of the drugs and was just doing Burciaga-Duarte a favor.  See PSR ¶ 18, at 5.

Agents took the Suburban to the Albuquerque Police Department's Secure Evidence Storage to dismantle the fuel tank.  See PSR ¶ 20, at 5.  The fuel tank contained four metal boxes that were welded shut.  See PSR ¶ 20, at 5.  The agents were eventually able to break open one of the boxes and found a green leafy substance inside that field-tested positive for marijuana.  See PSR ¶ 20, at 5.  The agents were not able to extract the marijuana from the other boxes and the marijuana was transported to the El Paso, Texas, HSI Seized Property specialist.  See PSR ¶ 20, at 5.  In El Paso, the remainder of the marijuana was extracted from the metal boxes.  See PSR ¶ 20, at 5.  In total, the marijuana weighed 104 kilograms.  See PSR ¶ 20, at 5.

## PROCEDURAL BACKGROUND

On May 9, 2015, Burciaga-Duarte pled guilty to possessing with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See Plea Agreement, filed May 9, 2014 (Doc. 27)("Plea Agreement").  In the PSR, the USPO gives Burciaga-Duarte a base offense level of 26.  See PSR ¶ 27, at 6.  The USPO then adds 2 levels under § 2D1.1(b)(1) for possessing a firearm during the commission of a drug offense and subtracts 3 levels under § 3E1.1 for timely acceptance of responsibility, giving Burciaga-Duarte a total offense level of 25.  See PSR ¶¶ 28-36, at 6-7.  The USPO notes that, because there was no evidence suggesting that Burciaga-Duarte directed the drug courier, an aggravating-role

adjustment under § 3B1.1 is not warranted.  See PSR ¶ 22, at 5-6.  Based on a 2011 conviction for driving while intoxicated, the PSR assess Burciaga-Duarte a criminal history score of 1, which places him in criminal history category I.  See PSR ¶¶ 40-41, at 8.  Matching a criminal history category of I with a total offense level of 25 gives Burciaga-Duarte a Guidelines imprisonment range of fifty-seven to seventy-one months.  See PSR ¶ 67, at 12.  Because §§ 841(a)(1) and (b)(1)(B) mandate a five-year minimum term of imprisonment for Burciaga-Duarte, however, his Guidelines imprisonment range is sixty to seventy-one months.  See PSR ¶ 66, at 12.

The Court held a sentencing hearing on August 8, 2014.[2]  See Transcript of Hearing (taken August 8, 2014)("Tr.").[3]  Burciaga-Duarte took the floor first, and said that he fully accepts responsibility for his actions, and that he has done everything he can to cooperate with the United States.  See Tr. at 6:1-7 (Gleria).  Burciaga-Duarte said that he is a family person, he has a brother and four children living in the United States, and he has lived in the United States for many years.  See Tr. at 6:7-16 (Gleria).  The United States said that it did not oppose a sentence at the low end of the Guidelines range for Burciaga-Duarte.  See Tr. at 7:19-25 (Hurtado).

The Court noted that it was the first case involving solely marijuana that it had seen in many months and maybe even years.  See Tr. at 8:22-24 (Court).  The Court asked the United States if it was troubled by the fact that the Department of Justice ("DOJ") is not prosecuting marijuana cases in Colorado and Washington, but is willing to prosecute a Mexico citizen in

---

[2]Neither the United States nor Burciaga-Duarte filed a sentencing memorandum.

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

New Mexico.  See Tr. at 9:1-5 (Court).  The United States said that it was not troubled by that fact, because the safety-valve provision is in place to allow certain defendants to be sentenced under the mandatory minimum.  See Tr. at 9:6-10 (Court).  The United States noted that Burciaga-Duarte is not safety-valve eligible, because he admitted to possessing a firearm.  See Tr. at 9:12-23 (Hurtado).  The Court sentenced Burciaga-Duarte to sixty-months imprisonment, but noted that it was concerned about the DOJ's policy of turning a blind eye to marijuana distribution in certain states, but then prosecuting people in New Mexico for those same crimes. See Tr. at 15:2-14 (Court).

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory. See 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in § 3553(a)(2):

    **(A)**    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    **(B)**    to afford adequate deterrence to criminal conduct;

    **(C)**    to protect the public from further crimes of the defendant; and

    **(D)**    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors that § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C.

§ 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular

---

The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## ANALYSIS

The Court will sentence Burciaga-Duarte to the statutory minimum of sixty-months imprisonment. This case is a part of an unsettling trend in the United States of inconsistent enforcement of federal marijuana laws. Marijuana remains a "Schedule I" narcotic under the federal Controlled Substances Act, 21 U.S.C. §§ 801-971 ("CSA"), and carries a mandatory minimum of five years for anyone who manufactures, distributes, or possesses with intent to distribute 100 kilograms or more of it. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). Despite this federal prohibition, many state governments permit marijuana use for medical purposes, and three states -- Washington, Colorado, Oregon -- and the District of Columbia have recently decided to permit marijuana use for recreational purposes. Rather than increasing federal enforcement of the CSA to fill in the gaps left by local law enforcement in those states, the Executive Branch has chosen to implement a hands-off approach.

The Executive Branch first outlined its new marijuana policy in an August, 2012, speech by Attorney General Eric Holder, in which he said:

> Some issues are best handled at the state or local level.  And that's why I have today directed the United States Attorney community to develop specific, locally tailored guidelines -- consistent with our national priorities -- for determining when federal charges should be filed and when they should not.  This is why I have today mandated a modification of the Justice Departments charging policies so that certain low-level, nonviolent drug offenders who have no ties to large-scale organizations, gangs, or cartels will no longer be charged with offenses that impose draconian mandatory minimum sentences.  They will now be charged with offenses for which the accompanying sentences are better suited to their individual conduct.

Eric Holder, U.S. Attorney General, Remarks at the Annual Meeting of the ABA (Aug. 12, 2013).[5]  The Executive Branch further explained its policy in a memorandum that Deputy Attorney General James M. Cole issued to the United States Attorneys in August, 2013.  See Memorandum from James M. Cole, Deputy Attorney General, to United States Attorneys (Aug. 29, 2013)("Cole Memo.").[6]

The Cole Memo sets forth eight broad priorities for federal prosecutors "regardless of state law":

- Preventing the distribution of marijuana to minors;

- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;

- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;

- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;

---

[5]Available at: http:// www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

[6]Available at: http:// www.justice.gov/iso/opa/resources/3052013829132756857467.pdf.

- Preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;

- Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and

- Preventing marijuana possession or use on federal property.

Cole Memo. at 1-2.

Outside of these eight priorities, however, the Cole Memo' "expresses strong deference to state law."  Bradley E. Markano Enabling State Deregulation of Marijuana, 90 N.Y.U. L. Rev. 289, 295 (2015).  The Cole Memo. says that "the existence of a strong and effective state regulatory system, and a[ marijuana] operation's compliance with such a system, may allay the threat that an operation's size poses to federal enforcement interests."  Cole Memo. at 3.  The Cole Memo. advises that, "in exercising prosecutorial discretion, prosecutors should not consider the size or commercial nature of a marijuana operation alone as a proxy for assessing whether marijuana trafficking implicates the Department's [eight] priorities."  Cole Memo. at 3.  The Cole Memo. instead suggests that federal prosecutors focus on "whether the operation is demonstrably in compliance with a strong and effective state regulatory system."  Cole Memo. at 3.

Whether as a result of the Executive Branch's new marijuana policy or the Colorado United States Attorney's independent decision not to prioritize marijuana prosecutions, there is a considerable discrepancy between the number of individuals convicted in the District of Colorado whose primary offense -- i.e., the offense for which that individual faced the highest statutory maximum sentence -- was violating federal marijuana laws, and those convicted of the same offenses in the District of New Mexico.  While three people were convicted in the District

of Colorado of such offenses in 2014, 352 individuals were convicted in the District of New Mexico for those crimes. Compare Statistical Information Packet at 1, Fiscal Year 2014, District of New Mexico, United States Sentencing Commission,[7] with Statistical Information Packet at 1, Fiscal Year 2014, District of Colorado, United States Sentencing Commission.[8]

At least one academic has criticized the Executive Branch's approach as undermining the CSA's deterrent effect. See Zachary S. Price, Enforcement Discretion and Executive Duty, 67 Vand. L. Rev. 671, 705 (2014)("Prospective nonenforcement -- that is, an announced promise of declining enforcement of a law in the future -- is a particular offense to legislative supremacy because it undermines the deterrent effect of the law. Similarly, categorical nonenforcement for policy reasons usurps Congress's function of embodying national policy in law."). Another argues that "[t]he federal government violates the rule of law when it chooses to apply federal laws without impartiality by prosecuting federal marijuana cases in states that have not legalized marijuana and turning a blind eye in states that have legalized marijuana." Melanie Reid, The Quagmire That Nobody in the Federal Government Wants to Talk About: Marijuana, 44 N.M. L. Rev. 169, 204 (2014). See Markano, Enabling State Deregulation of Marijuana, 90 N.Y.U. L. Rev. at 298 ("[A]lthough much scholarly attention has been devoted to the constitutional hazards of executive overreach, executive *underreach* presents an even more intractable problem." (emphasis in original)).

The press has also identified a number of problems from meshing fully operational marijuana organizations in Colorado -- which are illegal under federal law -- with other federal

---

[7]Available at: www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nm14.pdf.

[8]Available at: www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/co14.pdf.

laws.  First, proceeds from the sale of marijuana cannot be routed through banks without violating federal money laundering laws.  See Matt Richtel, The First Bank of Bud, N.Y. Times (Feb. 5, 2015),   http://www.nytimes.com/2015/02/08/business/marijuana-industry-in-colorado-eager-for-its-own-bank-waits-on-the-fed.html (noting that Don Childears, Chief Executive of the Colorado Bankers Association's argues that, "[m]arijuana is illegal at the federal level; banks that take money from illegal drug operations are guilty of money laundering; therefore, the banks that take pot money face serious criminal and civil liability").  Second, marijuana consumers cannot use credit cards to purchase a drug illegal under federal law.  See Jacob Sullum, Marijuana is Still a Pot of Trouble for Banks, Forbes Magazine (June 18, 2014), http://www.forbes.com/sites/jacobsullum/2014/09/18/local-banks-terrified-by-friendly-neighborhood-marijuana-merchants/ (quoting Julie Anderson Hill, a University of Alabama law professor, who says that, "[b]y facilitating customers' credit card payments, the [bank] would be aiding and abetting the distribution of marijuana" (internal quotation marks omitted)).  Third, marijuana organizations in Colorado need to pay their employees, withhold taxes, withhold social security, and benefits; activities that are difficult to conduct on a cash-only basis.  See Jeffrey Stinson, States Find You Can't Take Legal Marijuana Money to the Bank, Huffington Post (Jan. 5, 2015), http://www.huffingtonpost.com/2015/01/05/marijuana-money_n_6416678.html ("Without bank accounts, legal marijuana businesses have a hard time paying their employees and vendors. Relying solely on cash leads to a lack of transparency in accounting and auditing, and it complicates paying the taxes that states impose on cannabis.").  There are other problems that the Executive Branch's tacit legalization of marijuana in certain states has caused.  See Joseph Perrone, The Junk "Science" Behind the Marijuana Legalization Movement, The Washington Post (Oct. 20, 2014), http://www.washingtonpost.com/posteverything/wp/2014/10/20/the-junk-

science-behind-the-marijuana-legalization-movement/ (noting that "[a] handful of deaths in

Denver were tied to edible marijuana use this year, not to mention the increased risk of fatal car

accidents due to drivers impaired by marijuana."); Matt Ferner, <u>Colorado Asks Supreme Court to</u>

<u>Toss Marijuana Lawsuit Filed by Nebraska, Oklahoma</u>, Huffington Post (March 27, 2015),

http://www.huffingtonpost.com/2015/03/27/colorado-marijuana-lawsuit_n_6958336.html

(detailing Oklahoma and Nebraska's lawsuit against Colorado, which alleges that "Colorado's

legalization of marijuana caused a surge of marijuana trafficking in their states and created a

dangerous gap in the federal drug control system" (internal quotation marks omitted)).

  The Court does not need to, and should not, address these problems, or adopt these

criticism to the Executive Branch's new marijuana policy.  That debate primarily involves public

policy issues for the political branches to sort out, however they and the American people want

to deal with them.  The Judicial Branch -- <u>i.e.,</u> the unelected branch -- should speak lightly about

policy issues entrusted to the elected branches, unless it is necessary to decide a constitutional

separation-of-powers issue about who decides who decides those issues.  There is, however, one

issue entrusted to federal courts that involves federal marijuana laws: sentencing defendants

convicted of violating federal marijuana laws.  The Court is concerned solely about the effect of

the Executive Branch's policy on the Court's sentencing decisions.  Congress has directed

sentencing courts to create sentences that are "sufficient, but not greater than necessary" to

comply with four statutorily defined purposes enumerated in § 3553(a)(2):

> **(A)** to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;

> **(B)** to afford adequate deterrence to criminal conduct;

> **(C)** to protect the public from further crimes of the defendant; and

> **(D)** to provide the defendant with needed educational or vocational training,

> medical care, or other correctional treatment in the most effective
> manner . . . .

18 U.S.C. § 3553(a)(2). Congress also requires sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

The Executive Branch's decision to not enforce federal marijuana laws in certain states affects a number of factors set forth in § 3553(a). To come up with a sentence that adequately reflects those factors, the Executive Branch's policy puts downward pressure on the Court with regard to each of these factors in pure marijuana cases -- i.e., cases in which the defendant is convicted only of trafficking marijuana and no other drugs are involved. The Court continues to believe that marijuana manufacturing or distribution are serious offenses, and, without the policy change, would be inclined to impose sentences for marijuana offenses that hug the Guidelines range. The Executive Branch's policy suggests, however, that manufacturing or distributing marijuana are not as serious as Guidelines sentences reflect or as serious as other drug crimes. That the Executive Branch does not view marijuana crimes as serious enough to prosecute in certain states thus puts downward pressure on marijuana sentences before the Court.

Similarly, the Court has difficulty imposing a Guidelines sentence and expecting that sentence to promote respect for the law when the Executive Branch's words and actions demonstrate that it does not care if individuals in certain states respect the law at all. Indeed, respect for the law counsels that the Court should push sentences down for marijuana-related offenses as much as possible, so that the public and defendants do not suffer from harsh sentences only in states outside of Colorado, Washington, and Oregon. Likewise, unless courts

outside of those states sentence marijuana defendants below the Guidelines range, there will be unwarranted sentencing disparities among similarly situated defendants in those states and the rest of the country.  The Court also cannot soundly conclude that imposing a Guidelines sentence on a poor Hispanic individual caught distributing marijuana in New Mexico is "just punishment" when wealthier Anglos in states like Colorado and Washington receive no punishment whatsoever for the same offense.  After all, all of these people are selling marijuana for money, so their motives are not materially different solely because their actions occurred in different states.

Deterrence -- both general and specific -- is a difficult factor for the Court to emphasize in the § 3553(a) calculation for marijuana cases, given the Executive Branch's policy.  Burciaga-Duarte and any prospective federal marijuana offenders are not likely to be deterred unless they will face prosecution in federal court for their offenses, and the deterrence depends upon in which state the marijuana offense occurs.  Burciaga-Duarte may be deterred by a longer sentence, but no one in Colorado would be deterred by the sentence that the Court gives in this case.  There may be specific deterrence with the sentence -- i.e., Burciaga-Duarte may not commit his next marijuana crime in New Mexico -- but general deterrence is severely undermined by the Executive Branch's policy.  The marginal deterrence of a longer sentence in this case is undermined by whether future crimes are committed in Colorado or New Mexico. The same can be said for promoting public safety.  The public in New Mexico is no more or less deserving of public safety than the people of Colorado, Washington, or Oregon.  If the Executive Branch has determined that marijuana no longer threatens the safety of those latter states' residents, there is no sound basis to conclude that New Mexico residents somehow face a greater threat from the same criminal conduct.

The Court's job, as a district judge, is not to come up with a reasonable sentence, but is to come up with a sentence that fully and adequately reflects the factors in § 3553(a).  See United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).").  Nevertheless, the Court has a difficult time concluding that sentences which pound poor Hispanic defendants in New Mexico like Burciaga-Duarte for marijuana crimes when largely Anglo entrepreneurs are making millions off the same crimes in Colorado are reasonable, adequate, or fully reflect the § 3553(a) factors.  Accordingly, the Court's duty to reasonably, adequately, and fully apply the § 3553(a) factors places significant downward pressure on sentences for marijuana offenses.

Finally, if the largely Anglo entrepreneurs in Colorado are making millions while Hispanics in New Mexico are being prosecuted for the same criminal conduct, imposing a Guidelines sentence appears to be greater than necessary to comply with the purpose of punishment set forth in the Sentencing Reform Act.  This factor also pushes marijuana sentences downward.  In the end, given what is occurring in Colorado, all the factors that Congress requires that the Court consider in sentencing counsel for a below-the-Guidelines sentence.  In light of these concerns, the Court will be inclined to use carefully tailored conditions of supervised release rather than incarceration to punish marijuana defendants in future cases.

Given the downward pressure that the Executive Branch's policy puts on federal marijuana sentences, the Court must determine if there are other factors that counsel for a Guidelines sentence.  No such factors are present here.  Despite living in the United States for over twenty years, Burciaga-Duarte has a relatively short criminal history.  He has no prior convictions or arrests for violent offenses.  Because there is "no information to show [Burciaga-

Duarte] directed the courier, other than paying for the controlled substance and/or delivery," the USPO has determined that Burciaga-Duarte "was not an organizer or leader in this case."  PSR ¶ 22, at 6.  Furthermore, Burciaga-Duarte has five children, all of whom live in the United States and at least one of whom is a United States citizen.  See PSR ¶¶ 56-57, at 11.  For the last six years, Burciaga-Duarte has been self-employed; he earns an average of $1,500.00 a month repairing, buying, and selling vehicles.  See PSR ¶ 62, at 12.  Nevertheless, Burciaga-Duarte will spend the next five years in prison, because of the statutory minimum set forth in §§ 841(a)(1) and (b)(1)(B).  While the Court has no qualms about statutory minimums, see United States v. Nolf, 30 F. Supp. 3d 1200, 1221-23 (D.N.M. 2014)(Browning, J.)("Congress' institutional primacy in the sentence-setting process remains unquestioned."), it is difficult to conclude that Burciaga-Duarte is any more deserving of a five-year sentence than are individuals who manufacture and distribute much larger quantities of marijuana in Colorado, Washington, and Oregon.

The United States would likely have two objections to the Court's criticisms.  First, the United States has indicated that it is prosecuting only marijuana cases that involve money going back to Mexico.  While at first blush that might sound like a factor worthy of consideration, the reality is that, in 2015 -- with the exceptions of Colorado, Washington, and Oregon -- a significant percentage of the marijuana sold in the United States is grown in Mexico.  See Beau Kilmer, Marijuana Legalization Wouldn't End Drug Crime in Mexico, N.Y. Times (Jan. 13, 2014),    www.nytimes.com/roomfordebate/2013/05/22/how-can-marijuana-be-sold-safely/why-marijuana-legalization-wouldnt-end-drug-crime ("Much of the marijuana consumed in the U.S. comes from Mexico.  It's impossible to know exactly, but my colleagues and I put the range at 40 to 67 percent for 2008.").  Since the drug kingpins in Mexico usually stay in Mexico -- for

fear of capture in the United States -- those arrested for federal marijuana offenses in the United States are, by and large, low-level couriers and street dealers. When the United States says that it will prosecute only pure marijuana cases that come from Mexico, it fails to acknowledge or comprehend what is actually going on in New Mexico. In the Court's view, the actions of those who are being prosecuted for federal marijuana offenses in New Mexico actually look a lot like those who are making millions in Colorado, or are, in reality, much lower on the production and distribution hierarchy. There is no sound reason to treat the two groups differently.

Second, the United States would say that it is prosecuting federal marijuana offenses only where there is not a "strong and effective state regulatory system" in place. Cole Memo. at 3. While the Court will leave to the political branches to decide the wisdom of that approach, and it may explain why the United States is not prosecuting federal marijuana offenses in Colorado, that dictate does not seem to mean much when the federal courts are sentencing the people that the United States decides to prosecute. It is unclear why the New Mexico federal court should give a Guidelines sentence to a defendant in New Mexico for the same criminal activity that the United States tacitly permits in Colorado, Washington, and Oregon, just because state law varies. State laws vary across the country in myriad areas, but that has never been seen as a justification to inconsistently apply federal law. Indeed, the idea of federal law -- and goal of the Guidelines sentencing ranges -- is to make certain, as much as possible, that every defendant -- regardless whether they are prosecuted in Colorado, New Mexico, or Washington -- is sentenced as similarly as possible.

Despite the Court's concerns with the Executive Branch's marijuana policy, it must faithfully apply federal law. Ultimately, it is up to the United States to determine which cases to prosecute, what charges to bring, and whether to seek the statutory minimum. For the reasons

stated on the record, the Court will sentence Burciaga-Duarte to the statutory minimum of sixty-months imprisonment. Here, based upon a total offense level of 25 and a criminal history category of I, the Guideline imprisonment range is 57 to 71 months. See PSR ¶ 67, at 12. The statutory minimum is five years, however, which cuts the Guideline range off at 60-months imprisonment. See PSR ¶ 67, at 12. Unless there are particularly aggravating circumstances, which are not present here, the Court usually sentences at the low end of the range. Given what is occurring in Colorado, and that the United States did not oppose a sentence at the low end of the Guidelines range, the Court believes that sticking with the statutory minimum is appropriate.

In sum, the Court has, as this record and the sentencing hearing record reflects, carefully calculated the Guidelines range of 57 to 71 months, which the statutory minimum cuts off at 60 months. In arriving at its sentence, however, the Court has taken account not only of the Guidelines, but of other sentencing goals. Specifically, the Court has considered the Guidelines of the applicable category offenses committed by the applicable category of defendant. Given what is occurring -- or not occurring -- in Colorado, the Court believes the statutory minimum is appropriate. The Court has carefully considered the kinds of sentences and ranges that the Guidelines establish, and the Court concludes that a sentence of 60 months -- the statutory minimum -- is adequate to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, avoid unwarranted sentencing disparities, and otherwise fully reflect all relevant factors in § 3553(a). The Court also believes that, given Burciaga-Duarte's criminal history and background, and that Congress has implemented a mandatory minimum, the sentence is reasonable. The Court concludes that this sentence is sufficient, without being greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

**IT IS ORDERED** that Defendant Raul Burciaga-Duarte is sentenced to 60-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Damon P. Martinez
  United States Attorney
Stephen R. Kotz
Cynthia L. Weisman
Samuel Hurtado
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

Kenneth Gleria
Albuquerque, New Mexico

     _Attorney for the Defendant_